UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

JOSUE OLVERA ARMIJO, ET AL                    CIVIL ACTION

VERSUS                                        NO. 11-2493
                                               c/w 12-2667

TETRA TECHNOLOGIES, INC.                      SECTION  "N"  (5)

## ORDER AND REASONS

Before the Court are:  (1) a Motion for Summary Judgment on Third Party Demand, filed by third-party plaintiffs Tetra Technologies, Inc. and Maritech Resources, Inc. (Rec. Doc. 118); and (2) Continental Insurance Company's Motion for Summary Judgment, filed by third-party defendant Continental Insurance Company ("Continental"), seeking to dismiss Tetra's and Maritech's third-party claims (Rec. Doc. 117).   Opposition and reply memoranda are found at Rec. Docs. 122, 124, 127 and 132.

## I.  BACKGROUND:

Five plaintiffs, including Abraham Mayorga, filed suit seeking damages for personal injuries they sustained offshore while assisting in a crane operation to remove a dismantled bridge that had connected two sections of an oil production platform located in the Gulf of Mexico off the coast of Louisiana.  *See* Complaint & 2d Am. Complaint (Rec. Docs. 1, 27).   It is alleged that defendant Maritech Resources, LLC ("Maritech") owned the platform and that Maritech and defendant Tetra Technologies, Inc. ("Tetra") were engaged in decommissioning

the platform, including removal of the bridge.  Rec. Doc. 27 at ¶¶ 8(a), 9.   This work was being

performed pursuant to a Salvage Plan.  Rec. Doc. 118-7.  The crane was located on the derrick

barge *D/B Tetra Arapaho*, owned and/or operated by Tetra.   Rec. Doc. 1 at ¶ 8.   Three of the

plaintiffs are alleged to be Tetra employees and crew members of the *D/B Tetra Arapaho*.  *Id.* at

¶ 5.  A fourth plaintiff was the employee of a welding subcontractor.  *Id.* at ¶ 6.  Abraham

Mayorga is alleged to have been an employee of Vertex Services, LLC ("Vertex").  *Id.* at ¶ 7.

He worked as a rigger, Rec. Doc. 118-8, and was assigned to work from the *D/B Tetra Arapaho***.**

Rec. Doc. 1 at ¶ 7.

It is alleged that the plaintiffs were directed by their Tetra supervisors to make various

cuts to the supporting structures of the bridge.  *Id.* at ¶ 11.  After cutting the supporting

structures, they were directed to attach four nylon straps to the bridge, which were to be used to

lift bridge and place it on an adjacent barge.  *Id.* at ¶ 13.   Once the straps were attached, the

crane operator applied force to lift the bridge, but although it moved slightly, it did not break free

of the platform.  *Id.* at ¶ 14.  At the direction of the barge superintendent and the barge foreman,

the plaintiffs went out onto the bridge to determine what else needed to be done to free the

bridge.  *Id.* at ¶ 16.   While the plaintiffs were on it, the north end of the bridge collapsed, and the

straps (which allegedly had been allowed to hang slack rather than being held taught) gave way.

*Id.* at ¶ 17.  The bridge and everyone on it fell 70 to 80 feet into the Gulf of Mexico.  *Id.*

The plaintiffs filed suit against Tetra and Maritech, alleging that their injuries were

caused by the negligence of Tetra and Maritech and/or the unseaworthiness of the *D/B Tetra*

*Arapaho*.  Rec. Docs. 1, 27, 101.  Tetra and Maritech then filed an indemnity action against

Vertex and its insurer, Continental Insurance Company ("Continental").  *See* Civil Action 12-

2667 (Rec. Doc. 1).   They allege that Vertex is obligated to defend and indemnify them against Mayorga's claims based upon a Master Service Agreement (the "MSA") entered into between Vertex and Tetra.  *Id.* at ¶¶ 7-10.  Tetra and Maritech also allege that they are additional insureds under Vertex's General Liability insurance policy with Continental and that, as such, they are entitled to be defended, indemnified, and held harmless from Mayorga's claims and to be indemnified for any liability or expenses arising out of the action, including reimbursement of costs and attorney fees.  *Id.* at ¶¶ 11-12.

Now before the Court are cross motions for summary judgment on the indemnity claim. Tetra and Maritech seek declaratory judgment proclaiming that Vertex and Continental are obligated to defend and indemnify them against Mayorga's claims.  Continental seeks dismissal of the indemnity claims on grounds that the indemnity agreement between Tetra and Vertex is void under the Louisiana Oilfield Anti-Indemnity Act ("LOIA"), which applies by virtue of the Outer Continental Shelf Lands Act ("OCSLA").  Alternatively, Continental argues that even if the agreement is not void, insurance coverage is excluded under various provisions of the policy.

## II.  <u>LAW AND ANALYSIS</u>:

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

The MSA entered into between Tetra and Vertex provides:

> **Contractor** [Vertex] **shall RELEASE, DEFEND, INDEMNIFY and HOLD HARMLESS Company Group** [Tetra and its contractors and employees] **and Company's customer** [in this case, Maritech] **from and against any and all Claims for personal or bodily injury to, sickness, disease or death of any member of Contractor Group** [Vertex and its contractors and employees] **... arising out of the performance of this Agreement or any Order,** ***REGARDLESS OF FAULT***.

3

MSA § 12(C)(I) (Rec. Doc. 118-2 at 9 of 14) (bold, all capitals and italics in original; brackets added).[1]  The MSA also requires that Vertex obtain and maintain various insurance policies, including comprehensive general liability insurance, and that the policies "shall name Company Group [Tetra and its contractors and employees] as an additional insured...." *See* MSA § 12(B)(ii) and (vi) (Rec. Doc. 118-2 at 8 of 14).

The Marine Services Liability Policy issued by Continental to Vertex (the "Policy") provides that Continental "will pay those sums, in excess of the deductible, that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies."  Rec. Doc. 118-4 at 18 of 63.  The term "insured" is defined to mean "any person or organization qualifying as such under the WHO IS AN INSURED (Section II) with respect to this Coverage Form."  *Id.*  Endorsement No. 18 modifies "Who is an Insured" section "to include any person or organization as an Insured under this policy to the extent you [Vertex] are obligated by an 'insured contract' to include them as Additional Insureds, but only with respect to 'your work.' "  Rec. Doc. 118-4 at 60 of 63.  "Insured contract" is defined to include "[t]hat part of any other contract or agreement pertaining to your business...under which you assume the tort liability of another party to pay for 'bodily injury' or 'property damage' to a third person or organization...."  Rec. Doc. 118-4 at 11 of 63.  Continental does not dispute that the MSA is an "insured contract."  *See* Rec. Doc. 117-1 at 2 n.1.

Thus, the damages owed by Tetra and Maritech to Mayorga are covered under the Policy

---

[1]  See full definition of "Company Group" and "Contractor Group" at MSA § 12(A)(i) and (ii) (Rec. Doc. 118-2 at 6 of 14).

unless:  (1) the LOIA applies (via OCSLA) to render the MSA's indemnity and additional insured provisions void; or (2) the damages are otherwise excluded under the Policy.

### A.  Does the OCSLA Provision Adopting Adjacent State Law Apply?

In general, the LOIA renders void indemnity provisions which purport to provide defense and/or indemnity for damages arising out of death or bodily injury caused by the indemnitee's own fault.  La. Rev. Stat. Ann. § 9:2780 (West 2009).   Because the underlying events occurred in a portion of the Gulf of Mexico lying above the outer Continental Shelf, Louisiana law would not apply by its own force.  Indeed, the parties to the MSA agreed that Texas law would govern their agreement.  *See* MSA § 16 (Rec. Doc. 118-2 at 10 of 14).   However, Continental argues that the LOIA applies by virtue of the OCSLA.  Under certain circumstances, the OCSLA borrows the law of the adjacent state (here, Louisiana) as surrogate federal law.[2]  Thus, a threshold question is whether this provision of OCSLA applies.

---

[2]  *See* 43 U.S.C. § 1333(1), (2)(A), which provides in pertinent part:

(1) The Constitution and laws and civil and political jurisdiction of the United States are extended to the subsoil and seabed of the outer Continental Shelf and to all artificial islands, and all installations and other devices permanently or temporarily attached to the seabed, which may be erected thereon for the purpose of exploring for, developing, or producing resources therefrom, or any such installation or other device (other than a ship or vessel) for the purpose of transporting such resources, to the same extent as if the outer Continental Shelf were an area of exclusive Federal jurisdiction located within a State....

(2)(A) To the extent that they are applicable and not inconsistent with this subchapter or with other Federal laws and regulations of the Secretary now in effect or hereafter adopted, the civil and criminal laws of each adjacent State, now in effect or hereafter adopted, amended, or repealed are declared to be the law of the United States for that portion of the subsoil and seabed of the outer Continental Shelf, and artificial islands and fixed structures erected thereon, which would be within the area of the State if its boundaries were extended seaward to the outer margin of the outer Continental Shelf....

The parties agree on the basic test.   The Fifth Circuit has determined that under OCSLA, state law will apply as surrogate federal law if the following three conditions are met:   "(1) The controversy must arise on a situs covered by OCSLA (*i.e.*, the subsoil seabed, or artificial structure permanently or temporarily attached thereto); (2) Federal maritime law must not apply of its own force; (3) The state law must not be inconsistent with federal law." *Union Texas Petroleum Corp. v. PLT Engineering, Inc.*, 895 F.2d 1043, 1047 (5ᵗʰ Cir.), *cert. denied*, 498 U.S. 848 (1990).   If any of the three is not satisfied, state law will not apply.

## 1.      Did the Controversy Arise on an OCSLA Situs?

The first requirement under the *PLT* test is an OCSLA situs.   Continental argues that the situs requirement is satisfied because the accident occurred on a fixed platform on the OCS. Tetra and Maritech argue that this is the wrong test.   They are correct.   Where, as here, the claim sounds in contract rather than tort, the situs of the accident does not control.   *Grand Isle Shipyard, Inc. v. Seacor Marine, LLC,* 589 F.3d 778, 786-87 (5ᵗʰ Cir. 2009) (en banc), *cert. denied*, 130 S.Ct. 3386 (2010).   Instead, the Fifth Circuit's decision in *Grand Isle* requires that courts apply a focus-of-the-contract test:   "[A] contractual indemnity claim (or any other contractual dispute) arises on an OCSLA situs if a majority of the performance called for under the contract is to be performed on stationary platforms or other OCSLA situses enumerated in 43 U.S.C. § 1333(a)(2)(A).   It is immaterial whether the underlying incident that triggers the indemnity obligation occurs on navigable waters or on a platform or other OCSLA situs."   *Id.* at 787.   Thus, the relevant question is where was the majority of the performance called for under the contract to be performed.

Here, as is common, the Tetra and Vertex entered into a "blanket" Master Service Agreement (the "MSA") that did not describe any specific work or services to be performed, but rather contemplated that Tetra would issue written and/or "verbal" work orders from time to time as needed. *See* MSA §§ 1, 2 (Rec. Doc. 118-2 at 3 of 14).   The Fifth Circuit has made clear that in such cases, the master agreement and work order must be interpreted together.[3]  *Grand Isle,* 589 F.3d at 787 n. 6.   Moreover, "in determining situs in a contract case such as this, courts should ordinarily look to the location where the work is to be performed pursuant to the specific work order rather than the long term blanket contract." *Id.*

Here, neither side has submitted any evidence regarding the specific work order for Mayorga's assignment to the job in question.   Even if no formal work order was executed, the *Grand Isle* focus-of-the-contract test requires the Court to weigh the evidence to determine where the majority of the work order was located.   If no formal work order was issued, such

---

[3]  The *Grand Isle* court stated:

> [I]t is a common practice for companies contracting for work in the oilfield to enter into contracts in two stages. Typically, they first sign a "blanket contract" that may remain in place for an extended period of time. Later, they issue work orders for the performance of specific work, which usually incorporates the terms of the blanket contract. As we said in *Davis & Sons* [*v. Gulf Oil Corp.*, 919 F.2d 313 (5th Cir.1990)], where the contract consists of two parts, a blanket "contract followed by later work order, the two must be interpreted together."

> Generally, each work order is for a discrete, relatively short-term job. Unless a contrary intent is reflected by the master contract and the work order, in determining situs in a contract case such as this, courts should ordinarily look to the location where the work is to be performed pursuant to the specific work order rather than the long term blanket contract.

589 F.3d at 787 n. 6.

evidence may take the form of testimony, service tickets, or time sheets.  *See, e.g.*, *Ace American Ins. Co. v. M-I, L.L.C.*, 699 F.3d 826, 831 (5th Cir. 2012) (where no formal work order was issued, looking to service tickets and time sheets as evidence of where the contractor performed work under the MSA).   The only evidence in this regard consists of excepts of Mayorga's deposition testimony in which he states that he worked as a rigger and that at the time of the accident, he had been on this particular job almost two years.  Rec. Doc. 118-8 at pp. 2-7 of 19. The only specific work described in the excerpts are Mayorga's actions on the night of the accident.   It appears that much of Mayorga's work that night was performed on the fixed platform, cutting support ties on the bridge.  Without more, however, it is impossible to extrapolate this over the duration of the work order.

The MSA sheds no light on the nature of the work order, merely describing the nature of the contemplated work under the MSA as "general oilfield services."   MSA § 1 (Rec. Doc. 118-2 at 3 of 14).  Tetra and Maritech point to the Salvage Plan.  However, this document describes the project that Tetra was to perform for Maritech.  It sheds no light onto what services Vertex was to provide to Tetra and where such services were to be performed.   Without some elucidating testimony it is not even self-evident where a majority of Tetra's work under the Salvage Plan would have been performed – on its barges or on the platform itself.  Certainly, there is no evidence that would support a finding one way or the other as to where a majority of *Vertex's* work was to be performed.   Thus, neither side is entitled to judgment as a matter of law on this issue.

8

## 2.    Does Federal Maritime Law Apply of Its Own Force?

The second requirement of the *PLT* test is that maritime law must not apply of its own force. *PLT*, 895 F.2d at 1047. In the case of a claim for contractual indemnity, this question is answered by determining whether the contract in question is a maritime contract. *See, e.g., Grand Isle*, 589 F.3d at 789. The Fifth Circuit has established a two-step inquiry for answering this question. The first step is to examine "the historical treatment of contracts of that type in the jurisprudence." *Ace*, 699 F.3d at 831 (citing *Davis & Sons, Inc. v. Gulf Oil Corp.*, 919 F.2d 313, 316 (5th Cir. 1990)). The second step is to make a "six-factor fact-specific inquiry" into the nature of the specific contract at issue. *Id.* (citing *Davis*, 919 F.2d at 316). The six factors to be examined are:  "1) what does the specific work order in effect at the time of injury provide? 2) what work did the crew assigned under the work order actually do? 3) was the crew assigned to work aboard a vessel in navigable waters; 4) to what extent did the work being done relate to the mission of that vessel? 5) what was the principal work of the injured worker? and 6) what work was the injured worker actually doing at the time of injury?" *Davis*, 919 F.2d at 316.

Tetra and Maritech urge the Court to follow *Alex v. Wild Well Control, Inc.,* 2009 WL 2599782 (E.D. La. 2009). In *Wild Well*, Judge Fallon found that a contract to provide rigging personnel and services aboard a vessel in connection with the salvaging of a platform was a maritime contract. *Id.* at 9. In reaching this conclusion, he observed that "[salvage activities constitute a traditional maritime concern." *Id.* However, even from the scant evidence submitted by the parties as to the nature of the work order here, it is evident that it differs in

9

certain respects from that at issue in *Wild Well*.  For example, in *Wild Well*, "[a]ll of the work called for by the MSC [master service contract] was to be performed from a vessel in navigable waters." *Id.*  Here, at least on the night of the accident, Mayorga performed at least some of his duties on the fixed platform, rather than on the vessel.  Because no party has submitted evidence in this regard, the Court is unable to determine whether this was a regular occurrence, much less the percentage of time Vertex's services were rendered on the platform as opposed to the vessel. Also, in *Wild Well*, the plaintiff (a member of the personnel provided under the service agreement) was determined to be a member of the crew of the dynamic positioning vessel at issue in that case.  *Id.* at *1.  Here, although three of the plaintiffs are alleged to have been crew members of the *D/B Tetra Arapaho*, Mayorga is not.  *See* Rec. Doc. 1 at ¶¶ 5,7.  Finally, in *Wild Well*, it was clear that the vessel at issue there "was never permanently or temporarily attached to the seabed." *Wild Well*, 2009 WL 2599782 at *1.  Here, there is no evidence in this regard.

In short, there is insufficient evidence in the record here to determine enough about the nature of MSA and work order even to make an informed analogy for purposes of determining whether it is the type of contract traditionally regarded as maritime.   There is far from enough evidence to answer the six questions of the *Davis* fact-specific inquiry.  Indeed, of the six factors, there is only evidence regarding the sixth factor (What work was the injured worker doing at the time of the injury?).  Consequently, as with the first *PLT* requirement, the parties have not submitted adequate evidence to support a finding in favor of either side on the issue of whether maritime law should apply to the MSA of its own force.

10

### 3.        Is the LOIA Inconsistent with Federal Law?

The third *PLT* requirement — that state law not be inconsistent with federal law — is the

only one that can be deemed satisfied.   Tetra and Maritech argue that the LOIA is inconsistent

with federal law because Mayorga's claim against Tetra is for vessel negligence under section

905(b) of the Longshore & Harbor Workers Compensation Act ("LHWCA"), and, unlike the

LOIA (which voids agreements to indemnify against damages caused by the indemnitee's own

fault), section 905(c) of the LHWCA specifically allows such agreements between "the employer

... and the vessel ...," provided they are reciprocal.   33 U.S.C. § 905(c).   Assuming without

deciding that the indemnity agreements in the MSA would in fact qualify as "reciprocal," Tetra's

argument fails nevertheless because Tetra contracted with Vertex in its capacity as contractor,

not as vessel owner.   The Fifth Circuit has made clear that for section 905(c) to apply, "the

contracting entity must be contracting in its capacity as the vessel, not as a party who

incidentally utilizes a vessel in other operations."   *Wagner v. McDermott, Inc.*, 79 F.3d 20, 23

(5th Cir.), *cert. denied,* 519 U.S. 945 (1996).   Here, as in *Wagner*, it is clear from the MSA that

Tetra "was not acting in its capacity as vessel owner but only as a contractor who incidentally

utilized a vessel to accomplish its work."   *Id.*   That Tetra "happens to own the vessel does not

place the contract within § 905(c)."   *Id.*   Thus, as in *Wagner*, having determined that the MSA is

not governed by section 905(c), the Court "need not determine whether the Louisiana Act is

inconsistent with § 905(c)."   *Id.*   Accordingly, the Court can find no reason to depart from the

numerous decisions in which the Fifth Circuit has found that the LOIA is not inconsistent with

federal law.   *See, e.g.*, *Grand Isle*, 589 F.3d at 789.

11

**B.      Assuming State Law Does Apply, Does the LOIA by Its Terms Apply to Void the Indemnity Agreement in This Case?**

As discussed above, the record does not support a conclusion in favor of either Tetra or Continental on the issue of whether Louisiana law should apply as surrogate federal law to the MSA.   Tetra and Maritech argue that they are entitled to summary judgment even if the Court determines that Louisiana law does apply because the contract at issue does not "pertain to a well" and thus does not fall within the scope of the LOIA.

The LOIA provides in pertinent part:

B.  Any provision contained in, collateral to, or affecting an *agreement pertaining to a well* for oil, gas, or water, or drilling for minerals which occur in a solid, liquid, gaseous, or other state, is void and unenforceable to the extent that it purports to or does provide for defense or indemnity, or either, to the indemnitee against loss or liability for damages arising out of or resulting from death or bodily injury to persons, which is caused by or results from the sole or concurrent negligence or fault (strict liability) of the indemnitee, or an agent, employee, or an independent contractor who is directly responsible to the indemnitee.

C.  The term "agreement," as it *pertains to a well* for oil, gas, or water, or drilling for minerals which occur in a solid, liquid, gaseous, or other state, as used in this Section, means any agreement or understanding, written or oral, concerning any operations related to the exploration, development, production, or transportation of oil, gas, or water, or drilling for minerals which occur in a solid, liquid, gaseous, or other state, including but not limited to drilling, deepening, reworking, repairing, improving, testing, treating, perforating, acidizing, logging, conditioning, altering, plugging, or otherwise rendering services in or in connection with any well drilled for the purpose of producing or excavating, constructing, improving, or otherwise rendering services in connection with any mine shaft, drift, or other structure intended for use in the exploration for or production of any mineral, or an agreement to perform any portion of any such work or services or any act collateral thereto, including the furnishing or rental of equipment, incidental transportation, and other goods and services furnished in connection with any such service or operation.

La. Rev. Stat. Ann. § 9:2780(B) and (C) (West 2005) (emphasis added).   From this language, the Fifth Circuit has established a two-step inquiry for determining the applicability of the LOIA:  "First, there must be an agreement that 'pertains to' an oil, gas or water well.  If the contract does not pertain to a well, the inquiry ends."  *Transcontinental Gas Pipe Line Corp. v. Transportation Ins. Co.*, 953 F.2d 985, 991 (5th Cir. 1992).   To determine whether this factor is met, the Court must examine the "details affecting the functional and geographic nexus between 'a well' and the structure or facility that is the object of the agreement under scrutiny."  *Id.* at 995.  Only if the court determines that the contract has the required "nexus to a well" may the court "proceed to the second step of the process, examination of the contract's involvement with 'operations related to the exploration, development, production, or transportation of oil, gas, or water.' "  *Id.* at 991.  Thus, the LOIA will apply "if (but only if) the agreement (1) pertains to a well *and* (2) is related to exploration, development, production, or transportation of oil, gas, or water."  *Id.*  (emphasis in original).   Determining whether this test is satisfied "does not lend itself to any overarching bright line standard," but instead, requires a "fact intensive case-by-case analysis."  *Id.* at 994.

Here, Tetra and Maritech argue that the work order[4] in question does not pertain to a well because the salvage operation took place on platforms that already had been "fully decommissioned" before the salvage operation commenced.  *See* Salvage Plan § 3.6 (Rec. Doc.

---

[4]  Tetra and Maritech are correct that the work order is the correct agreement for determining this issue.  *See Roberts v. Energy Development Corp.,* 104 F.3d 782, 784 n.3 (5th Cir. 1997).

118-7 at 3 of 8).   Continental offers no evidence to dispute the fact that the platforms in question

had already been fully decommissioned prior to the commencement of the salvage operation.

Nor does Continental offer any evidence that would tend to establish a functional or geographic

nexus between any well and the platforms in question.   Indeed, the only argument that

Continental offers on this issue is to suggest that the Court follow Judge Lemelle's decision in

*Dennis v. Fluid Crane Constr., Inc.*, 823 F. Supp. 2d 415 (E.D. La. 2011).   However, *Dennis* is

inapposite.   As Continental notes, the question in *Dennis* was whether the Texas Oilfield Anti-

Indemnity Act ("TOAIA") applied to an agreement to provide services in connection with the

dismantling and removal of a platform.   The *Dennis* court concluded that the TOAIA did apply,

but did not base this conclusion on a finding that the work at issue pertained to a well.   To the

contrary, the *Dennis* court specifically rejected the argument that the TOAIA should be applied

only where there is close nexus to a well.[5]  *Id.* at 419.   This Court, in determining whether the

Louisiana act applies, it not at liberty to reject the "nexus to a well" requirement, as it is well-

settled in the Fifth Circuit that an agreement must pertain to a well in order for the LOIA to

apply.   *See Roberts,* 104 F.3d at 784; *Johnson v. Amoco Production Co.*, 5 F.3d 949, 953-54 (5th

Cir. 1993); *Transcontinental*, 953 F.2d at 991.   Consequently, given that Continental has pointed

to no evidence supporting the existence of a nexus to a well, the Court finds that no genuine

_____

[5]  In so doing, the *Dennis* court expressly declined to follow the Fifth Circuit's holding in
*In re Complaint of John E. Graham & Sons*, 210 F.3d 333, 343 (5th Cir. 2000) ("We hold that a
contractor is 'otherwise rendering services in connection with a well' if the services called for by
the contract bear a close nexus to a well and are directed toward the goal of obtaining or
maintaining production from a well."), characterizing it as *dicta*.  *See Dennis*, 823 F. Supp. 2d at
419.

dispute exists and concludes that Tetra and Maritech are entitled to judgment as a matter of law declaring that the indemnity agreement contained in the MSA is not void, but is valid and enforceable as it relates to the claims of Abraham Mayorga.

### C.   Is Additional Insured Coverage Excluded under the Policy?

Continental argues that even if the indemnity agreement is valid and Tetra and Maritech qualify as additional insureds under the Policy, coverage is nevertheless lacking due to certain exclusions contained in the Policy.  Specifically, Continental argues that the following exclusions apply:

(1)   Exclusion (d), providing that coverage does not apply to obligations under worker's compensation laws, the LHWCA, the Jones Act, General Maritime Law, Federal Employer's Liability Act, disability benefits or unemployment compensation law, or any similar law;

(2)   Exclusion (e), providing that coverage does not apply to injuries to employees of the insured;

(3)   Exclusion (g), providing that coverage does not apply to injuries arising out of use of a watercraft owned, leased, or chartered to an insured; and

(4)   Endorsement No. 2, which excludes coverage for damages with respect to crew members of the insured vessel.

Continental argues that Texas law applies to the Policy.[6]  Texas courts interpret insurance

---

[6]  Tetra and Maritech do not argue otherwise.

policies according to the common rules of contract construction.  *Likens v. Hartford Life and Acc. Ins. Co.*, 688 F.3d 197, 199 (5th Cir. 2012).  Thus, the Court must "evaluate the contract based on its plain meaning, determining what the words of the contract say the parties agreed to do." *Id.*   The Court must "examine the entire agreement and seek to harmonize and give effect to all provisions so that none will be meaningless." *Gilbert Texas Const., L.P. v. Underwriters at Lloyd's London*, 327 S.W.3d 118, 126 (Tex. 2010); *see also In re Deep Water Horizon.* — F.3d — , 2013 WL 776354 *3 (5th Cir. Mar. 1, 2013) (Courts should consider contracts "as a whole," and "may not adopt a construction that renders any portion of a policy meaningless, useless, or inexplicable.") (quoting *ATOFINA Petrochemicals, Inc. v. Cont'l Cas. Co.*, 185 S.W.3d 440, 444 (Tex.2005)).

"If policy language is worded so that it can be given a definite or certain legal meaning, it is not ambiguous, and the court construes it as a matter of law. ..." *American Intern. Specialty Lines Ins. Co. v.  Rentech Steel, LLC*, 620 F.3d 558, 562 (5th Cir. 2010) (citations and internal quotations omitted).   But "if the contractual language is susceptible to two or more reasonable interpretations," then the policy is ambiguous and must be construed "strictly against the insurer and liberally in favor of the insured." *Id.* (citations and internal quotations omitted).  This is especially so for exclusionary clauses. *Likens*, 688 F.3d at 199; *see also In re Deep Water Horizon,* 2013 WL 776354 *3 ("[i]n particular, exceptions or limitations on liability are strictly construed against the insurer and in favor of the insured," id., and "[a]n intent to exclude coverage must be expressed in clear and unambiguous language") (citations and internal quotations omitted).

16

Where the disputed language is an exclusion, "the insurer bears the burden of establishing that the exclusion applies." *American Home Assur. Co. v. Cat Tech L.L.C.,* 660 F.3d 216, 220 (5th Cir. 2011).   Indeed, it is a well-settled tenet of Texas law that "[w]here an ambiguity involves an exclusionary provision of an insurance policy," the Court "must adopt the construction ... urged by the insured as long as that construction is not unreasonable, even if the construction urged by the insurer appears to be more reasonable or a more accurate reflection of the parties' intent." *Id.* (quoting *Gilbert*, 327 S.W.3d at 133).

**1.  Exclusion (d):**

Exclusion (d) of the Policy provides that the insurance "does not apply to:"

> Any obligation of the insured under a workers compensation, United States Longshoremen's and Harbor Workers' Compensation Act, Jones Act, Death on the High Seas Act General Maritime Law, Federal Employers' liability Act, disability benefits or unemployment compensation law or any similar law.

Rec. Doc. 118-4 at 19 of 63.   Continental argues that this exclusion applies because Mayorga's claims are brought under the general maritime law.   Tetra and Maritech, on the other hand, argue that the exclusion is more reasonably read as excluding coverage for any form of employer's liability, but not for general liability claims under general maritime law, such those of Mayorga against Tetra and Maritech.   Tetra and Maritech assert three arguments in support of this construction.   First, they point to the phrase "or any similar law" contained in the exclusion. The inclusion of this phrase begs the question:   how are the enumerated laws similar?   As Tetra and Maritech point out, each of laws itemized provides for some form of worker compensation or employer liability.   Second, Tetra and Maritech point to a clause in exclusion (e), which

17

provides:  "This exclusion applies...[w]hether the insured may be liable as an employer or in any other capacity."  Rec. Doc. 118-4 at 19 of 63.   Tetra and Maritech argue that if Continental had intended exclusion (d) to apply to general liability claims under the general maritime law, then it would have included such a clause in exclusion (d).  That it chose not to do so supports Tetra and Maritech's argument that the exclusion was intended to reach only obligations in the nature of worker compensation and employer liability.  Third, Tetra and Maritech argue that to construe the exclusion as Continental suggests would lead to the "anomalous conclusion" that Vertex paid premiums for a "Marine Services Liability Policy" that excluded coverage for any and all general liability claims arising under maritime law.  (Rec. Doc. 124 at 4 of 10).   Texas courts look with disfavor on policy constructions that would render coverage under a policy or endorsement largely illusory.[7]   Continental offers no counter-arguments in response, but simply rests on its assertion that the phrase "general maritime law" should be read without qualification.

The Court need not find Tetra and Maritech's construction to be the *more* reasonable one in order to conclude that exclusion (d) does not apply.  Under Texas law, so long as the insured's

---

[7]   *See Davis-Ruiz Corp. v. Mid-Continent Cas. Co.,* 281 Fed. Appx. 267, 274 (5th Cir. 2008); *ATOFINA Petrochemicals, Inc. v. Cont'l Cas. Co.*, 185 S.W.3d 440, 444 (Tex. 2005) (rejecting insurer's construction of an exclusion because it "would render coverage under the endorsement largely illusory"); *Trinity Universal Ins. Co. v. Cowan*, 945 S.W.2d 819, 828 (Tex. 1997) (rejecting insurer's interpretation in part because it "would render insurance coverage illusory for many of the things for which insureds commonly purchase insurance"); *St. Paul Ins. Co. v. Texas Dept. of Transp.,* 999 S.W.2d 881, 886-87 (Tex. Ct. App. 1999) ("St. Paul collected a premium for coverage of additional insureds but would interpret its professional services exclusion to exclude all such coverage.  St. Paul's interpretation would render the policy meaningless to all additional insureds—in this case, all persons required to be named by Abrams as 'additional protected persons.'"); *cf. Mid-Continent Cas. Co. v. Bay Rock Operating Co.*, 614 F.3d 105, 114 (5th Cir. 2010) ("Under Texas law, we are required to interpret '[c]ontract provisions ... so as to avoid meanings that produce unreasonable, oppressive, or absurd results....' ") (quoting *Cont'l Sav. Ass'n v. U.S. Fid. & Guar. Co.,* 762 F.2d 1239, 1245 (5th Cir. 1985)).

construction is not unreasonable, then the Court must adopt it.  *See, e.g.*, *American Home,* 660

F.3d at 220 ("Where an ambiguity involves an exclusionary provision of an insurance policy, [a

court] must adopt the construction ... urged by the insured as long as that construction is not

unreasonable, even if the construction urged by the insurer appears to be more reasonable or a

more accurate reflection of the parties' intent.") (quoting *Gilbert*, 327 S.W.3d at 133).  The Court

finds the construction of exclusion (d) urged by Tetra and Maritech to be reasonable.

Accordingly, the exclusion does not apply to the claims at issue here.

### 2.  Exclusion (e):

Exclusion (e) of the Policy provides that the insurance "does not apply to:"

> "Bodily injury" to:
>
> (1) An "employee" of the insured arising out of and in the course of:
>
> (a) Employment by the insured; or
>
> (b) Performing duties related to the conduct of the insured's business; or
>
> (2) The spouse, child, parent, brother or sister of that "employee" as a consequence of paragraph (I) above.
>
> This exclusion applies:
>
> (1) Whether the insured may be liable as an employer or in any other capacity; and
>
> (2) To any obligation to share damages with or repay someone else who must pay damages because of the injury.
>
> This exclusion does not apply to liability assumed by the insured under an "insured contract".

Rec. Doc. 118-4 at 19 of 63.  Continental acknowledges that Mayorga is alleged to be an employee

of Vertex, not an employee of Tetra or Maritech.   It argues that exclusion (e) applies "to the extent

that Mayorga is found to be an employee or leased worker of Tetra." Rec. Doc. 117-1 at 15 of 18. Given that no one has asserted that Mayorga is an employee of Tetra or Maritech, and that Continental offers no evidence that such is the case, the Court finds exclusion (e) inapplicable.

   3. **Exclusion (g):**

   Exclusion (g) of the Policy provides that the insurance "does not apply to:"

   "Bodily injury" or "property damage" arising out of:

   (1) The ownership, maintenance, use or entrustment to others of any watercraft owned, leased, rented or chartered to any insured. Use includes operation and "loading or unloading".

   This exclusion g(1) does not apply to:

   (a) A watercraft while ashore on premises you own or rent; or

   (b) liability assumed under any "insured contract" for the ownership, maintenance or use of watercraft;

Rec. Doc. 118-4 at 19 of 63. Continental argues that this exclusion applies because plaintiffs allege that Mayorga's injuries were caused in part by the unseaworthiness of the *D/B Tetra Arapaho*. Rec. Doc. 117-1 at 15-16. According to Continental, this is equivalent to alleging that the damages arise out of Tetra's ownership and use of the barge. *Id.* at 16. Tetra and Maritech argue that this exclusion does not apply because Mayorga has also asserted that his injuries were caused by negligence on the part of Tetra and Maritech which is separate and independent of Tetra's ownership and/or use of the barge.[8]

   As support for this argument, Tetra and Maritech rely on *Terra Resources, Inc. v. Lake*

---

   [8] Tetra and Maritech argue in the alternative that if exclusion (g) applies, then Maritech is entitled to coverage under the Policy's Charterers Liability Coverage. Rec. Doc. 124 at 7-9. However, the Court agrees with Continental (Rec. Doc. 127) that such coverage is limited to the Named Insured — in this case, Vertex — and does not extend to additional insureds added under Endorsement No. 18.

*Charles Dredging & Towing, Inc.,* 695 F.2d 828, 831 (5th Cir. 1983), and *Farrell Lines, Inc. v. Insurance Co. of North America,* 789 F.2d 300, 305-06 (5th Cir. 1986).   In *Terra,* the Fifth Circuit held that where an insured's "liability arises from two sources, an exclusion pertaining to one source does not preclude coverage based on the other."   *Terra,* 695 F.2d at 831.   The court found that the insured's "ownership of the mooring device was such a separate and independent source of potential liability, not encompassed by the watercraft exclusion."   *Id.*   In so holding, the court rejected the insurer's argument that if no watercraft had been used, no mooring would have been necessary, and no accident would have occurred.   Although the insured owned the barge involved, "this need not have been the case."   *Id.*   Ownership of the mooring device was "completely independent" of the insureds' ownership and use of the barges:   "The damage would still have occurred if the barges had not been owned by [the insureds]."   *Id.* Thus, failure of the mooring device was "a totally independent basis" for the insureds' liability, and the watercraft exclusion did not apply.   *Id.*; *see also Farrell*, 789 F.2d at 305-06 (finding that insured's position as lessee of the allegedly defective container was separate source of liability, independent of insured's ownership of the vessel, such that watercraft exclusion did not apply).[9]

Tetra and Maritech are correct that Mayorga has asserted several allegations against them which would create a separate source of liability wholly independent of Tetra's ownership and use of the *D/B Tetra Arapaho*.   In addition to the alleged unseaworthiness of the *D/B Tetra Arapaho*,

_____

[9]  *Terra* and *Farrell* were decided under Louisiana law.  Although Continental has argued that Texas law applies to the Policy, it has offered no contrary Texas law on this issue.  Further, although it has attempted to distinguish *Terra* on the facts, it has not argued that the rule articulated there is inapplicable because the case involved a Louisiana policy.  Therefore, given that Continental bears the burden of establishing that the exclusion applies, *Am. Home,* 660 F.3d at 220, and given that the treatment of the exclusion proposed by the insureds is a reasonable one, the Court will follow the approach articulated in *Terra* and *Farrell.*

Mayorga alleges that his injuries were caused by the following acts of negligence and/or fault on the part of Tetra:

> 1. Nylon straps should not have been utilized for this particular lift and/or were improperly rigged in a manner that allowed the straps to be cut on the edges of angle iron supporting the bridge due to being shock loaded;
>
> 2. Loose piping and other unsecured objects were not removed from the bridge prior to the lift to prevent injury to personnel or damage to equipment;
>
> 3. The decommissioning operations should have been postponed until daylight hours or until sufficient lighting could have been obtained;
>
> 4. The crane operator should not have allowed so much slack on the slings after attempting the original lift, as a shock load to the nylon straps could been prevented if the slings would have had a foot or less of slack;
>
> 5. The failure to properly supervise the decommissioning operations while attempting to remove a bridge that connected two platforms in a safe manner and to protect the equipment and employees, *i.e.* failing to address all hazards before allowing employees to board the bridge;
>
> 6. Requiring Plaintiffs to gather on the decommissioned bridge while only suspended by rigging of the crane on the D/B TETRA ARAPAHO; and
>
> 7. Any other acts of negligence which will be shown at the trial of this matter.

Rec. Doc. 27 at 3-4.  In addition, Mayorga asserts that his injuries were caused by the following acts of negligence and/or fault on the part of Maritech:

> 1. Failure to properly design the decommissioning plan;
>
> 2. Failure to provide proper specifications for the materials to be used in the rigging and for securing and lifting the bridge involved in the accident herein;
>
> 3. Failure to ensure that loose piping and other unsecured objects were removed from the bridge prior to the lift to prevent injury to personnel or damage to equipment;

4. Failure to postpone the decommissioning operations until daylight hours or until sufficient lighting could have been obtained;

5. Failure to ensure that the crane operator maintained proper tension on the slings after attempting the original lift, as a shock load to the nylon straps could been prevented if the slings would have had a foot or less of slack;

6. Failure to properly supervise the decommissioning operations while attempting to remove a bridge that connected two platforms in a safe manner and to protect the equipment and employees, *i.e.* failing to address all hazards before allowing employees to board the bridge;

7. Allowing Plaintiffs to gather on the decommissioned bridge while only suspended by rigging of the crane; and

8. Any other acts of negligence which will be shown at the trial of this matter.

Rec. Doc. 27 at 4-5.   Tetra and Maritech are correct that certain of the claims against Tetra (*e.g.*, failure to remove loose object and failure to postpone operations until daylight) and virtually all of the claims against Maritech are completely independent of Tetra's ownership of the *D/B Tetra Arapaho* using the test articulated in *Terra*.   For damage to attach under these allegations, it "need not have been the case" that Tetra owned or used the barge.  *Terra*, 695 F.2d at 831.  "The damage would still have occurred if the barges had not been owned by" Tetra and/or Maritech.   *Id.* Therefore, the watercraft exclusion does not apply to bar coverage for additional insured liability to the extent it arises from one or more of these independent sources.   Based on the record before the Court, it is impossible to determine what if any of Tetra's and/or Maritech's liability arises from owership and/or use of the *D/B Tetra Arapaho* versus other independent sources of liability.   Thus, summary judgment is not appropriate on this issue.[10]

---

[10]  Continental has acknowledged that exclusion (g) does not apply to liability assumed in an "insured contract."  Given that Continental has conceded that the MSA constitutes an "insured contract" under the Policy, it is unclear what practical effect, if any, exclusion (g) will have on Continental's obligations.

4. __Endorsement No. 2:__

Endorsement No. 2 of the Policy provides:

> Crew Members & Employees Exclusion
> In consideration of the premium charged, it is understood and agreed that this policy excludes any loss, damage, claims or expense with respects to employees of the Assured and/or members of the crew of the Vessel insured hereunder.

Rec. Doc. 118-4 at 43 of 63.   Continental argues that this endorsement should apply because plaintiffs allege in their complaint that Mayorga was "assigned to work from the D/B TETRA ARAPAHO."  Complaint ¶ 7 (Rec. Doc. 1).   Ergo, according to Continental, Mayorga must have been a crew member, which would bring his claims within Endorsement No. 2.   This argument is without merit.

First, the plaintiffs' allegation about Mayorga's work is in contrast to their allegations about plaintiffs Josue Olvera Armijo, Jose Luis Ponce-Zuniga, and Kyle Ivy, whom plaintiffs allege were "assigned as *members of the crew* of the D/B TETRA ARAPAHO."  Complaint ¶ 5 (Rec. Doc. 1) (emphasis added).   Given the absence of such an allegation regarding Mayorga, one cannot reasonably infer from the complaint that Mayorga was a crew member.    Second, Mayorga applied for and was found eligible for compensation under the LHWCA.   *See* Rec. Doc. 188-9.  By definition, Mayorga would not have been eligible for such compensation had the United States Department of Labor found him to be a member of the crew of a vessel.  *See* 33 U.S.C. § 902(3)(G) (the term "employee" under the LHWCA specifically excludes "a master or member of a crew of any vessel").   Continental has offered no evidence to the contrary. Accordingly, the Court finds Endorsement No. 2 to be inapplicable.

III.  **CONCLUSION**:

Accordingly, for the reasons stated above;

**IT IS ORDERED** that:

1) Tetra and Maritech's Motion for Summary Judgment on Third Party Demand, **(Rec. Doc. 118)** is hereby **DENIED IN PART**, in that it is denied with respect to additional insured coverage under the Policy to the extent that Abraham Mayorga's injuries arose out of Tetra's and/or Maritech's ownership, maintenance, or use of the *D/B Tetra Arapaho*, and **GRANTED IN PART**, in that it is granted in all other respects;

2)  Continental Insurance Company's Motion for Summary Judgment **(Rec. Doc. 117)** is hereby **GRANTED IN PART**, in that it is granted with respect to additional insured coverage under the Policy to the extent that Abraham Mayorga's injuries arose out of Tetra's and/or Maritech's ownership, maintenance, or use of the *D/B Tetra Arapaho*, and **DENIED IN PART**, in that it is denied in all other respects; and

3)  The parties shall inform the Court at the pretrial conference as to what issues, if any, remain to be tried.

New Orleans, Louisiana, this 27th day of March, 2013.

**KURT D. ENGELHARDT**
**UNITED STATES DISTRICT JUDGE**